**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KOSHER SKI TOURS INC.,<br><br>*Plaintiff*,<br><br>-*against*-<br><br>OKEMO LIMITED LIABILITY COMPANY,<br><br>*Defendant*. | Case No. 20-CV-09815 (VB) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR LEAVE TO AMEND/SUPPLEMENT COMPLAINT**

**LAW OFFICE OF**
  **SOLOMON N. KLEIN**

Solomon N. Klein
99 Wall Street, Suite 1915
New York, NY 10005
Tel.: (212) 575-0202
Fax: (347) 467-2798
E-Mail: sklein@schlamstone.com

*Counsel for Plaintiff Kosher Ski Tours, Inc.*

Served: July 26, 2021

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... i

PRELIMINARY STATEMENT ........................................................................................... 1

    A. The Instant Action........................................................................................................ 3

    B. Okemo and Vail Resort Executives Terminate the Holiday Agreement to Prevent a Presence of Orthodox Jews at its Resort During the Pandemic .................................. 3

    C. Okemo Approves a Group Reservation for a Non-Orthodox Ski Club ...................... 7

    D. The Standing Agreement ............................................................................................. 9

    E. Okemo Breaches the Standing Agreement ............................................................... 10

    F. The Proposed First Amended Complaint ................................................................... 11

    G. Case Status and Procedural History .......................................................................... 12

ARGUMENT ....................................................................................................................... 13

    I. THIS COURT SHOULD GRANT LEAVE TO AMEND/SUPPLEMENT THE COMPLAINT .......................................................................................................... 13

    A. Plaintiff Has Been Diligent in Seeking to Amend the Complaint and there is No Basis for Defendant to Demonstrate Prejudice ......................................................... 14

    B. The Amended Pleading is Not Futile ........................................................................ 14

    a. The Discrimination Claims ........................................................................................ 15

    b. The Breach of the Standing Agreement ..................................................................... 15

CONCLUSION .................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

*Altowaiti v. Cissna*, 2020 U.S. Dist. LEXIS 74706 (S.D.N.Y. Apr. 20, 2020) ......................13, 14

*Bed Bath & Beyond Inc. v. IBEX Constr., LLC*,
    52 AD3d 413 (1st Dept 2008)...................................................................................................17

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482-483,................16

*E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 458 (2d Cir. 2014) ...................................16

*First Am. Int'l Bank v. Community's Bank*
    2012 U.S. Dist. LEXIS 136474, *24 (S.D.N.Y. Sept. 21, 2012)............................................17

*Jin v. Metro. Life Ins. Co.*,
    310 F.3d 84 (2d Cir. 2002)......................................................................................................13

*McCarthy v. Am. Int'l Grp., Inc.*,
    283 F.3d 121, 124 (2d Cir. 2002)............................................................................................17

*Permatex, Inc. v. Loctite Corp.*, No. 03 Civ. 943, 2004 U.S. Dist. LEXIS 10953 .......................14

*Quaratino v. Tiffany & Co.*,
    71 F.3d 58 (2d Cir. 1995)........................................................................................................14

*Watson v. Compagnie Financiére Richemont SA*,
    2020 U.S. Dist. LEXIS 154709 (S.D.N.Y. Aug. 25, 2020)....................................................15

*Williams v. Citigroup Inc.*, 659 F.3d 208 (2d Cir. 2011)...............................................................14

**RULES**

Fed. R. Civ. P. 15............................................................................................................... passim

Plaintiff Kosher Ski Tours, Inc. ("KST") respectfully submits this memorandum of law, along with the accompanying Declaration of Solomon N. Klein, in support of its motion to amend and supplement the Complaint.

## PRELIMINARY STATEMENT

KST requests leave to amend and supplement the Complaint to add discrimination claims and, based on events subsequent to the complaint, additional claims of breach of contract.

This Complaint in this action alleges that Okemo repeatedly claimed that pandemic "disruptions" made it impossible to honor the Holiday Agreement to give KST a block of rooms for the past Chanukah holiday, which KST was then to market and sell to Orthodox Jewish guests.

However, the parent company of Okemo ("Vail Resorts"), when incentivized to play down reports of "disruptions," filed the following with the Securities and Exchange Commission about the recent winter ski season: "**We have welcomed guests to each of our resorts with no major ongoing disruptions**[.]"  (Exh. D (emphasis added).)

From the onset, KST recognized that Okemo's claims of "disruptions" were pretextual and the Original Complaint alleged that Okemo's motive was likely greed.  But it is clear from the documents in discovery that Okemo rejected KST for discriminatory reasons, and at the same time even approved a non-Orthodox Jewish group at discounted rates.

 Simply put, Okemo did not want a large presence of Orthodox Jews at its resort during the pandemic.  Citing a news report about an Orthodox Jewish camp in Vermont that allegedly violated restricted occupancy rates, Okemo executives did not want KST, saying that they were "concerned that attendees of the group won't comply with the regs" and were concerned about the optics and "bad publicity."

Okemo also demanded special assurances from KST that its guests will comply with quarantine and regulatory requirements, in contrast to non-KST customers where Okemo maintained an "honor system" for compliance.  Indeed, while Okemo and Vail Resorts executives refused even a few rooms for KST (no "count that is acceptable"), these same executives at the same time approved the group lodging of at least one non-Orthodox Jewish ski club at discounted rates.

The discriminatory intent and bad faith is further evidenced by the great pains taken by executives to avoid a paper trail.  Sales personnel at Okemo "chatted" about the executives' "verbal" discriminatory statements – while repeatedly voicing frustrations that they were "never able to get anything . . . in writing" about KST from higher-ups.

Okemo's claims of "disruptions" were a mere pretext to discriminate against Orthodox Jews.  Okemo terminated the Holiday Agreement and refused to accept any bookings by KST.

Subsequent to the filing of the Complaint, Okemo breached yet another earlier standing agreement between the parties.  On October 25, 2019, the Parties had entered into a three-year Standing Agreement (confirming specific discounted lodging and ski rates).  Once again, using Covid-19 as a pretext and despite being open for business, Okemo refused to accept reservations from KST for even a minimal number of its guests (*e.g.*, 30 guests) through KST for the recent Passover holiday.

Accordingly, Plaintiffs moves pursuant to Rule 15 for leave to file the accompanying amended/supplemented complaint.  KST has moved for leave at the earliest opportunity and promptly upon learning the new facts.  The new claims in the amended complaint are on firm legal and factual footing and would easily survive a motion to dismiss.  Finally, the amendment will have a minimal effect on the scheduling and efficient disposition of the case.

**FACTUAL BACKGROUND**

**A.    The Instant Action**

This action was originally filed in the Supreme Court of the State of New York, Rockland County, in October 2020 (Index No. 034827/2020).  On November 20, 2020, Defendant removed the action to this Court.  (Dkt. No. 1.)

Plaintiff KST markets and operates group ski tours and vacations focused on serving Orthodox Jewish vacationers and skiers.  (Prop. Am. Compl. ¶ 17.)[1]  KST filed this action against Okemo for breach of a December 27, 2019 agreement (the "Holiday Agreement"), under which KST purchased 492 "room nights" for December 10-14, 2020 (during the Chanukah holiday) at Okemo's ski resort in Vermont.  (Exh. A-2.)  The Holiday Agreement also entitled KST to buy lift tickets at a specified group rate. (*Id*. at p. 2.)

In its Original Complaint, KST alleges that Okemo's claims of "disruptions" were pretextual and that Okemo did so out of greed.  Indeed, when Okemo terminated the Holiday Agreement, it believed that overall individual bookings at Okemo were strong enough to overcome the termination ("Kosher Ski Tours has been cancelled . . . . [w]hat we lost in group was made up in transient[.]").

**B.    Okemo and Vail Resort Executives Terminate the Holiday Agreement to Prevent a Presence of Orthodox Jews at its Resort During the Pandemic**

The documents produced in discovery have revealed that Defendants' executives targeted KST because they did not want a significant number of Orthodox Jews.  Despite the fact that KST paid the deposit binder as per the Holiday Agreement, Okemo repeatedly refused to honor

---

[1]    The Proposed First Amended Complaint ("Prop. Am. Compl.") is attached as Exhibit A of the accompanying Declaration of Solomon N. Klein, dated July 26, 2020.  A redline showing changes to the original complaint is attached as Exhibit B.  The Original Complaint is attached as Exhibit C).

the Holiday Agreement and then unilaterally notified KST by phone on September 17, 2020, followed up by e-mail on September 18, 2020 that it terminated the Holiday Agreement.  (Prop. Am. Compl. ¶ 27.)

The termination came just as KST was beginning to book reservations for its customers, leaving KST in an untenable position with its own customers.  (*Id.* ¶ 28.)  Okemo did not provide any detailed explanation for its purported lack of ability to honor its obligation under the Holiday Agreement, stating merely that Covid-19 has continued to "disrupt . . . [its] way of doing business."  (*Id.*)

Okemo's claims of "disruptions" were a pretext.  Okemo terminated the Holiday Agreement because it did not want KST's Orthodox Jewish customers.  (*Id.* ¶ 29.)  Okemo's executives claimed that KST's customers would not comply with regulations (citing a media report about violations by an Orthodox camp) and were concerned about negative publicity.  (*Id.* ¶ 29; Exhs. A-5, A-6.)

Okemo refused even a few rooms for KST (no "count that is acceptable"), even though these same executives that rejected KST then approved the group lodging of at least one non-Orthodox Jewish ski club – despite the fact that the non-Orthodox club was an actual social group that came to ski together.  (*Id.* ¶ 30.)  The Holiday Agreement also had rates that were favorable to KST, which allowed Okemo to discriminate without incurring significant losses and, as a general.  Indeed, when Okemo terminated the Agreement, the Revenue Manager for Okemo and an affiliate, Robert Charlock, sent a widely-distributed email stating: "Kosher Ski Tours has been cancelled . . . . [w]hat we lost in group was made up in transient[.]"  (*Id.*)

4

However, Okemo did not offer to accept reservations from KST even at non-group rates, claiming that it just simply cannot accept KST's guests.  Okemo did not give KST the opportunity to bring *any* number of customers at *any* rate.  (*Id.* ¶ 31.)

At least three executives were involved in the decision-making, Dennis Barquinero (Senior Director at Okemo), Robert Charlock (Revenue Manager for Okemo), and Lance Thompson (Vice President of Hospitality at Vail Resorts).  (*Id.* ¶ 32.)

These Okemo executives took great pains to avoid a paper trail regarding their deliberations about KST.  Employees in the sales department that communicated with KST repeatedly referred to receiving "verbal" instructions regarding KST and repeatedly complained that they "were never able to get anything . . . in writing" regarding KST.  (*Id.* ¶ 33; Exhs. A-3, A-4.)  Despite Okemo's efforts to avoid leaving a record of discrimination, contemporaneous "chat" conversation between two individuals in the sales department documented that Okemo was unfairly being "harder on Yakov [KST's principal] than others" and left a record of what actually happened. (*Id.* ¶ 34; Exh. A-10.)

Upon information and belief, Ms. Braucht believed that Okemo could host at least some of KST's guests and was frustrated by the refusal of Okemo executives to consider any number of KST guests.  (*Id.* ¶ 35.)  The "chat" messaging between Ms. Braucht and her colleague provides a record of what actually happened – despite Okemo's efforts to keep things "verbal."

> Braucht: [08/27/2020 4:02:21 PM]:
> Dennis [Barquinero] is concerned that the attendees of the group wont comply with the regs
>
> Braucht: [4:02:50 PM]:
> RC [Robert Charlock] is concerned about bad publicity if the attendees dont comply

Braucht: [4:04:09 PM]:
I have not been able to gather a count that is acceptable to djb [Barquinero] or
RC [Charlock]

Braucht: [4:06:07 PM]:
When I suggested to Yaakov that his guests may not follow the rules he
countered that his guests live in NY and they are very aware of the
consequences of not following covid guidelines bc people are dieing and
losing jobs all around them"

Braucht: [4:06:07 PM]:
djb [Barquinero] said he doesnt believe Yaakov and cites this as an example:
https://www.wcax.com/content/news/Orthodox-Jewish-camp-in-Rutland-
warned-over-COVID-violation-571680461.html

Braucht: [4:06:07 PM]:
Yes, I discussed over zoom and also emailed the strict guidelines and what
quarantine actually means (no synagogue, not grocery store etc.) and he
promises he understands and also says he will talk to each guest individually.
djb [Barquinero] says that Yaakov might talk to one family member in each
party but not each guest. Not sure how that's different to FIT [individual]
guests making reservations over the phone but.... there you go

Sarah F.: 4:46:45 PM:
agree with you. Dennis can't be harder on Yakov than others so that is where
this is almost getting personal or rather very subjective. and he if doesn't want
the group, he has to say that and we advise Lance of that and move on.

(Exh. A-5—A-10.)

KST has no connection to the camps cited by Okemo as a reason not to trust KST (other

than sharing the same ethnic and religious identity), and KST's marketing and re-selling its block

of rooms to Orthodox Jewish families has no similarities to a camp. (*Id.* ¶ 35.)

To the extent relevant at all, according to the media report, local residents complained

about two Orthodox Jewish camps in Vermont, but both camps were in compliance with

Vermont regulations, except that one camp was somewhat over the 50% capacity limit in place at

the time.  Both camps were allowed to continue operating after reducing the number of campers.

The screen caption in the article states: "Vermont says they're following rules".

Okemo's mistrust of KST's Orthodox Jewish guests stands in stark contrast to the "honor system" that Okemo generally employed with regard to Covid restrictions.

For example, in response to a complaint filed with Vermont State authorities (unrelated to KST) about non-compliance at Okemo, Barquinero reminded Okemo's general manager not to probe into whether guests are actually in compliance with quarantine and Covid testing "If a guest is comfortable signing the [certificate of compliance], we are comfortable with it."  (Exh. A-11.)  Another Okemo employee also made it clear to a guest: "we are not acting as border patrol. . . . It is an honor system."  (Exh. A-12.)

Okemo did not probe into its guests' compliance even where common sense suggested that guests did not actually quarantine for 14 days prior to arrival.  For example, Okemo seems to have routinely accepted reservations from hotspot locations a day or two before arrival.  (*Id.* ¶ 40.)  As a general matter, rational people going through the effort of quarantining would make sure to reserve space before they go through the trouble of quarantining, but Okemo trusted their guests to comply.  KST and its Orthodox Jewish guests were denied this "honor system."  (*Id.*)

Indeed, at the same time that Okemo rejected KST, it went out of its way to approve a group of non-Orthodox ski club members, as described below.

### C.  Okemo Approves a Group Reservation for a Non-Orthodox Ski Club

KST signed contract was terminated by Okemo and Vail Resorts at the same that they were considering whether to accept new reservations from a non-Orthodox ski club seeking to bring a group.  The same executives that rejected KST guests, despite already being obligated by contract to provide the rooms for KST, approved a non-Orthodox ski club to bring its group.  The rates provided to the ski club were comparable to the low rates that had been given to KST

under the Holiday Agreement, even though the ski club was committing to fewer rooms and booking on more expensive dates.  (*Id.* ¶ 42.)

Indeed, Okemo approved the ski club even while recognizing that the claims of compliance never made any sense for this ski club – it would have required these non-Orthodox guests to quarantine over *both* Christmas and New Years in order to spend three days at Okemo.  (*Id.* ¶ 43.)  But, unlike with KST and its Orthodox Jewish guests, when the ski club said that it believed its guests would comply that was good enough for Okemo under its "honor system."  (That ski group ultimately decided to cancel for that reason, but it was the group that cancelled after Okemo and Vail Resorts had already approved the reservation and contract.)  (*Id.*)

Once again, the internal discussion between the sales personnel reveals that Okemo and Vail Resorts executives reviewed both KST and the ski club's at the same time, and the sales personnel seemed incredulous when they were able to get approval for the ski club after failing to get approval for KST.  (*Id.* ¶ 44.)  The discussion below was on September 17, 2020 (the day KST was informed by phone that Okemo will terminate the agreement).  At first, the sales personnel were discussing the best way to deliver rejections to *both* KST and the ski club – assuming they would be treated the same.

> Braucht: [09/17/2020 5:22:40 PM]:
> no... you and I need to figure out how to say no to 70+ [ski club] and Kosher
>
> Sarah F.: 5:25:56 PM:
> . . . And have you ever gotten feedback from Dennis [Barquinero]?
>
> Braucht: [09/17/2020 5:28:30 PM]:
> Not from Dennis, no response to email. He was verbal on ROCS [management meeting] re: Kosher. I dont know that he's had anything to say about 70+ [ski club]

(Exhs. A-13—A-15.)

But only KST was rejected.  (*Id.* ¶ 40.)  After Okemo terminated the Holiday Agreement, Ms. Braucht prepared an email proposal for Sarah Franzese, Director of Sales, to send to Mr. Thompson at Vail Resort requesting formal approval for a group reservation by the ski club. (Exh. A-16.)  The proposal noted that (unlike for KST) both Charlock and Barquinero approved the ski club group reservation.  (*Id.*)

Mr. Thompson immediately approved the reservation.  Ms. Franzese responded: "Thank you for the unbelievably QUICK reply!"  (*Id.*)

Okemo's termination of the Holiday Agreement and refusal to accept any reservations from KST has effectively put KST out of business.[2]

### D.    The Standing Agreement

On October 25, 2019, the Parties signed a three-year written agreement (the "Standing Agreement"). (Exh. A-1.)  The Standing Agreement was drafted by Okemo on its own letterhead.  (*Id.*)  In the Standing Agreement, Okemo wrote that "We are pleased to present to you the following lodging concessions from date of signed agreement through April 2022," which confirming specific lodging and ski rates for various times of the year at significant discounts off even group rates (up to 30% off best available group rates).  (Exh. A-1.)

The Standing Agreement has a set of terms and conditions setting forth how the pricing will be determined in the future, specific requirements for what constitutes a "group," eligibility

---

[2]    Okemo has begun resorting to hyperbole about "KST's reckless super spreader vacation" and intimating (Dkt. No. 21) that Okemo could not host KST's guests because of observances of Orthodox Jews (e.g., prayers).  This is pretextual.  Prior to the pandemic, non-Orthodox guests would congregate in Okemo's restaurant and lobby, and guests had expectations of social events and interactions.  With the pandemic, Okemo did not simply shut itself down.  Its guests adapted to limited indoor dining or ate in their suites as necessary to comply with regulations.  Similarly, Okemo and its affiliates adapted to continue robust operations.  Yet KST's customers somehow posed an unsolvable "super spreader" problem. At no point did Okemo say to KST: "These are the rules for everyone – if you can live with them, you, too, are welcome."

for refunds, the deadline for changes, and the deadline for submitting payments for any orders under the Standing Agreement. There is no requirement for a future agreement. The Standing Agreement merely requires that a "signed order form and full payment must be received at least (3) days prior to your arrival . . ." (*Id.*)

The Standing Agreement does not provide Okemo with any discretion to reject reservation requests other than those set forth in the "Terms and Condition" in the Standing Agreement.

At the time this action was filed, the Standing Agreement had not been breached or repudiated by Okemo, despite Okemo's breach of the Holiday Agreement. The Holiday Agreement superseded the Standing Agreement as to that transaction (Exh. A-2, at 4) and had more favorable terms to KST than the Standing Agreement because of the opportunity presented with Chanukah not overlapping with Christmas in 2020. (*Id.* ¶ 26.)

### E.     Okemo Breaches the Standing Agreement

On January 2021, counsel for KST emailed Okemo's counsel to notify them that KST wished to reserve rooms pursuant to the Standing Agreement. (*Id.* ¶ 50.) Okemo, however, disputed that Okemo has any obligations to accept reservations, and claimed that the Standing Agreement is merely a discretionary agreement – i.e., its sets prices but otherwise allows Okemo to decide if it wants to do business with KST. (*Id.* ¶ 51.)

Nonetheless, Okemo's counsel represented that "KST is welcome to see whether Okemo is able to accommodate the group during KST's desired dates." (*Id.* ¶ 52.) But Okemo gave KST the runaround and, for weeks. KST was unable to get anyone at Okemo to accept reservations or inform it of availability. (*Id.* ¶ 53.) At some point, an Okemo representative informed KST that someone will call back the next week, but the call was not returned. (*Id.*)

On February 21, 2021, KST emailed Cheryl Braucht seeking to get information for availability for the upcoming Passover holiday.  Okemo refused to provide its availability, but responded that it would need to know information.  KST informed Ms. Braucht that it would pretty much accept whatever Okemo's availability was – anywhere between 30-200 guests depending on availability. (Exh. A-17.)

After continuing to ask for details, on March 1, 2021, Okemo emailed KST that Okemo is refusing to accept KST bookings, citing unidentified "applicable regulations and requirements." (*Id.*)

As with the Okemo's refusal to honor the Holiday Agreement, Defendant's reliance on the Covid pandemic is pretextual and motivated by Okemo's effort to avoid a significant Orthodox Jewish presence – as evidenced by the general runaround given to KST and Okemo's refusal to cooperate with KST's efforts to discuss room availability or to provide anything more than generalized claims about "applicable regulations."

Simply put, there is no basis for Okemo to have refused to accept reservations for 30 guests, when Okemo is actively in operation.  Indeed, as many as one hundred KST customers circumvented Okemo's refusal by booking through the internet and phone for their Passover vacation where Okemo was unable to refuse reservations from Orthodox Jewish guests.  (*Id.* ¶ 57.)  This belies Okemo's claims they were prevented from accepting KST's reservations by "applicable regulations."

###    F.    The Proposed First Amended Complaint

In addition to pleading the above-alleged facts, the Proposed First Amended Complaint asserts two new contract-based claims relating to the Standing Agreement, a breach of the Standing Agreement (Second Cause of Action) and a breach of good faith and fair dealing as to the Standing Agreement (Third Cause of Action).

11

Regarding the claims of bias and discrimination, the Proposed First Amended Complaint asserts four new claims:

- Count IV: Violation of Public Accommodations Act, 42 U.S.C. §2000a
- Count V: Violation of 42 U.S.C. § 1981
- Count VI: Violation of 42 U.S.C. § 1982
- Count VII: Violation of Vermont Public Accommodations Act, 9 V.S.A. § 4502

The Proposed First Amended Complaint identifies four acts by Okemo that violated the above referenced statutes: *First*, Okemo discriminated against KST and its guests by refusing to perform the Holiday Agreement and the Standing Agreement because it did not want Orthodox Jewish guests at its resort.

*Second*, Okemo further discriminated against KST and its guests by terminating the Holiday Agreement because it did not want Orthodox Jewish guests at its resort.

*Third*, even in the absence of an agreement, Okemo discriminated against KST and its guests by not providing KST an opportunity to place reservations even at a higher price or for less rooms than provided for in the Holiday Agreement or Standing Agreement.

*Fourth*, Okemo discriminated against KST and its guests by requiring KST to provide additional proof of compliance with Covid-19 regulations and quarantine and other procedural barriers that it did not require from other guests seeking to place reservations.

### G.    Case Status and Procedural History

Defendant Okemo filed its answer on December 11, 2020.  (Dkt. No. 12.)  On July, 2021, the Court entered, upon consent of the parties, a Second Revised Civil Case Discovery Plan and Scheduling Order, with all discovery to be complete by November 8, 2021.  (Dkt. No. 53.)

On March 19, 2021, KST moved to supplement its complaint based on the breaches of the Standing Agreement.  (Dkt. 23).  Defendant opposed KST's motion, opposed leave to amend, arguing that it would futile because Standing Agreement was not an enforceable agreement.

That motion was fully briefed by the parties and was *sub-judice* until the motion was terminated. (Dkt. 56).

In June 2021, both parties made their first productions of documents, with Okemo completing its production on June 21, 2021. No depositions have been taken, with dispositions scheduled to begin August 9, 2021.  Plaintiff has not previously amended or supplemented its complaint.

Upon receiving the production and discovering the documentation of discriminatory conduct by Okemo, KST promptly informed the Court of its intent to seek leave to amend on July 9, 2021.  (Dkt. 54).  The Court terminated the earlier pending motion and directed KST to file a single motion with a proposed complaint containing all the proposed amendments.

## **ARGUMENT**

### I.    **THIS COURT SHOULD GRANT LEAVE TO AMEND/SUPPLEMENT THE COMPLAINT**

KST seeks leave to amend and supplement the complaint pursuant to Rule 15(a)(2) and 15(d) of the Federal Rules of Civil Procedure, respectively.[3]  "Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party."  *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002).  Similarly, where the supplemental pleading adds new claims, the "'same standard applies to both motions to amend pursuant to Rule 15(a) and motions to supplement pursuant to Rule 15(d).'"  *Altowaiti v. Cissna*, 2020 U.S. Dist. LEXIS 74706, *9 (S.D.N.Y. Apr. 20, 2020).  "Leave is normally granted, especially when the opposing party is not

---

[3]    To the extent that the newly-added allegations relate to the Standing Agreement, it is technically characterized as a supplement since it happened after the filing of the initial complaint.  For brevity, unless necessary in the argument, the term amendment refers to the supplement as well.

prejudiced by the supplemental pleading." *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995).

The "party opposing the motion bears the burden of establishing that an amendment would be prejudicial or futile." *Altowaiti*, 2020 U.S. Dist. LEXIS 74706, at *12 (citation omitted). It is a "permissive standard, since there is a 'strong preference for resolving disputes on the merits.'" *Id.* (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011).

### A.    Plaintiff Has Been Diligent in Seeking to Amend the Complaint and there is No Basis for Defendant to Demonstrate Prejudice

Plaintiff has been diligent in seeking the amendments on both the Standing Agreement and discrimination claims. The events relating to the Standing Agreement supplemental occurred after the case was filed. Plaintiff was diligent in submitting its request to supplement (in the original motion to supplement) upon discovering that Defendant will not honor the Standing Agreement (after waiting several weeks to determine whether Okemo will in fact accept KST's requests for bookings).

Similarly, the documents on which KST relies on for its discrimination case were produced last month June as part of a production of thousands of documents. Plaintiff promptly submitted a pre-motion letter for leave to amend on July 9, 2021. *See Permatex, Inc. v. Loctite Corp.,* No. 03 Civ. 943, 2004 U.S. Dist. LEXIS 10953, at *3 (S.D.N.Y. June 17, 2004) (holding that plaintiff exhibited diligence by moving to amend less than two months after deposition that brought new information to light).

### B.    The Amended Pleading is Not Futile

The claims added in the proposed supplement can easily survive a motion to dismiss and therefore are not futile. Importantly, "[b]ecause determinations of futility on a motion for leave to amend are subject to the same standards as motions under Rule 12(b)(6), futility is generally

adjudicated without resort to any evidence outside the face of the complaint." *Watson v. Compagnie Financiére Richemont SA*, 2020 U.S. Dist. LEXIS 154709, *2 (S.D.N.Y. Aug. 25, 2020). This is especially true in this case where no document discovery has occurred.

### a.  The Discrimination Claims

Defendant has so far not identified the basis for refusing to consent to the amendment as to the discrimination claims, nor has it indicated that it intends to raise a futility argument.

### b.  The Breach of the Standing Agreement

In its prior opposition to KST request for leave to supplement, Defendant advanced several futility arguments against the breach of contract and fair dealing as to the Standing Agreement. None of these satisfy Okemo's burden of establishing futility.

Defendant raised factual arguments or defenses that have no place under the futility analysis. For example, Defendant claimed that it cannot accept KST's bookings because KST's "group" is a "social gathering[] that accommodates guests from multiple households."[4] However, KST is not an event organizer of conventions or weddings. KST takes reservations from its website and markets skiing opportunities to the million or so Orthodox Jews in major Jewish population centers in New York and New Jersey – the guests arrive on their own and make their own arrangements of how to enjoy their vacation.

Okemo also claimed that the Standing Agreement, even if enforceable, is no longer in effect because some of the prices are pegged to a discount on the "best available rate for groups" and Okemo claims to no longer have group rates. This tortured analysis requires the Court to accept Okemo's factual premise as true (contrary to the motion to dismiss standard) and neglects the fact that Okemo has an implicit obligation to provide a group rate under the Standing

---

[4]    By Okemo's standard, no kosher hotel would be allowed to operate in the State of Vermont as it is a group of multiple families.

Agreement.  Finally, it neglects the common sense reading that a group can always purchase their rooms individually at retail – so the lowest available group rate would at worst be pegged to the retail purchase price.

Finally, Okemo indicated that it believes that the Standing Agreement, which was drafted by Okemo and presented to KST, is not an enforceable agreement.  That is incorrect.

To be enforceable, a contract must have the essential terms included in the agreement – a standard that is "necessarily flexible, varying for example with the subject of the agreement, its complexity, the purpose for which the contract was made, the circumstances under which it was made, and the relation of  the parties." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp*., 74 N.Y.2d 475, 482-483, *quoted by*, *E.M. v. New York City Dep't of Educ*., 758 F.3d 442, 458 (2d Cir. 2014).  "In order to be enforceable, a contract must 'contain all of the material terms which one would reasonably have expected to be included under the circumstances'" *McGowan v. Clarion Partners, LLC*, 2017 N.Y. Misc. LEXIS 39, *7 (Supreme Ct. N.Y. Co.) (quoting *Argent Acquisitions, LLC v First Church of Religious Science*, 118 A.D.3d 441, 444 (1st Dept 2014)).

The Standing Agreement has all the necessary elements for a contract confirming a standing commitment by Okemo for the terms therein: *First*, by its own terms, the document drafted by Okemo acknowledges that it is, in fact, an agreement and signed by both parties and specific as to the timeframe.  *See* Standing Agmt. at 1 ("We are pleased to offer you the following lodging concessions **from date of signed agreement** through April 2022") (emphasis added).  *Second*, the Standing Agreement is explicit with respect to its terms, including the duration of the contract, the pricing, and also sets forth both a 3-night and 10-room minimum. *Third*, the Standing Agreement was signed by both KST and Ms. Sarah Nasoff, Okemo's Sales

16

Manager, beneath Section 4 of the Standing Agreement which is clearly titled,

"**ACCEPTANCE.")** (emphasis in original).  It is hard to imagine a more obvious "meeting of

the minds."

Okemo argues that the entire agreement is discretionary because the Standing Agreement

states that a "[s]igned order form and full payment must be received at least (3) days prior to

your arrival."  This argument is incorrect for two reasons.

First, the Standing Agreement does not require and was not subject to any further

signature from Okemo.  Nowhere in the Standing Agreement, is there a "subject to" or

"discretion" clause that would allow Okemo discretion to unilaterally refuse to do business with

KST.  It requires a "signed order form and full payment" from KST and is not subject to further

action by Okemo.  The term "signed order form" is not something that Okemo would sign, and

in fact, the context of the sentence – "signed order form and full payment must be received . . ."

– clearly indicates that the signed order form would be signed and sent by KST, not Okemo.

And to the extent the "signed order form" is ambiguous, the doctrine of *contra proferentem*

would require that "'equivocal contract provisions are generally to be construed against the

drafter.'" *First Am. Int'l Bank v. Community's Bank*, 2012 U.S. Dist. LEXIS 136474, *24

(S.D.N.Y. Sept. 21, 2012) (quoting *McCarthy v. Am. Int'l Grp., Inc*., 283 F.3d 121, 124 (2d Cir.

2002)).

Second, even where an agreement explicitly requires further signed documentation, the

agreement is still enforceable where the material terms are otherwise present in the agreement.

*McGowan*, 2017 N.Y. Misc. LEXIS 39, *12 (citing *Bed Bath & Beyond Inc. v. IBEX Constr.,

LLC*, 52 AD3d 413, 414 (1st Dept 2008) ("holding that the use of "subject to" in the document

and reference to the execution of an agreement as a 'qualification,' do not amount to an express

17

reservation of the right not to be bound")).  Nothing in the Standing Agreement suggests that the parties were intending that the Standing Agreement be non-binding.

As such the amendment is not futile and the amendment and leave should be granted so that the matter can be determined on the merits.

## **CONCLUSION**

Accordingly, the Court should grant KST's motion to amend and supplement the complaint in the form attached as the Proposed First Amended Complaint in Exhibit A to the Declaration of Solomon N. Klein.

Dated: July 26, 2021
New York, New York

LAW OFFICE OF
SOLOMON N. KLEIN

By: /s/ Solomon N. Klein
Solomon N. Klein
99 Wall Street, Suite 1915
New York, New York 10005
Tel.: (212) 575-0202
Fax: (347) 467-2798
E-Mail: sklein@solomonklein.com

*Counsel for Plaintiff Kosher Ski Tours Inc.*